Emrich Enters., LLC v. Hornwood, Inc., 2022 NCBC 11.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 5659

EMRICH ENTERPRISES, LLC,
individually and derivatively on
behalf of TRIANGLE AUTOMOTIVE
COMPONENTS, LLC,

       Plaintiff,

v.

HORNWOOD, INC.,

       Defendant,

and

TRIANGLE AUTOMOTIVE
COMPONENTS, LLC,

       Defendant and
       Nominal Defendant.

**ORDER AND OPINION ON EMRICH
ENTERPRISES, LLC'S MOTION FOR
SUMMARY JUDGMENT AND
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
[Public][1]**

1.    **THIS MATTER** is before the Court on cross motions for summary judgment filed by Emrich Enterprises, LLC ("Plaintiff's Motion") and Hornwood, Inc. and Triangle Automotive Components, LLC ("Defendants' Motion") (collectively, the "Motions"), pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rule(s)").

2.    For the reasons set forth herein, the Court **GRANTS** Plaintiff's Motion and **GRANTS** in part and **DENIES** in part Defendants' Motion.

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court has allowed to remain under seal in this action, and out of an abundance of caution, the Court filed this Order and Opinion under seal on 15 February 2022 pending consultation with the parties regarding proposed redactions. (*See* ECF No. 202.) On 23 February 2022, the parties notified the Court that, after conferring, all parties agree there is no material in this Order and Opinion that requires sealing. Accordingly, the Court now files this public version of this Order and Opinion.

*Ellis & Winters LLP by Michelle Liguori, Emily Melvin, Jonathan D. Sasser, and Thomas H. Segars, for Plaintiff Emrich Enterprises, LLC.*

*Moore & Van Allen PLLC by Mark A. Nebrig and Kaitlin Price, for Defendant Hornwood, Inc. and Defendant and Nominal Defendant Triangle Automotive Components, LLC.*

Robinson, Judge.

## I.     INTRODUCTION

3.     Plaintiff Emrich Enterprises, LLC ("Emrich") and Defendant Hornwood, Inc. ("Hornwood") are the only members of Defendant Triangle Automotive, LLC ("Triangle").  Emrich brings this action, at least in part, as a derivative suit based on Hornwood's alleged breach of Triangle's governing documents and of Hornwood's fiduciary duties owed directly to Emrich and derivatively to Triangle.

## II.     FACTUAL BACKGROUND

4.     The Court does not make findings of fact when ruling on motions for summary judgment.  "[T]o provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication."  *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

### A. <u>Formation of Triangle</u>

5.     Emrich is a North Carolina limited liability company and is the minority member of Triangle.[2]  (Br. Supp. Defs.' Mot. Summ. J. Ex. 16, ECF No. 147.17 ["Defs.' Ex. 16"]; Second Am. Compl. ¶ 14.)

---

[2] Plaintiff's Second Amended Complaint is verified and therefore was received and treated by the Court as an affidavit.  *Page v. Sloan*, 281 N.C. 697, 705 (1972) ("A verified complaint may be treated as an affidavit if it (1) is made on personal knowledge, (2) sets forth such facts as

6. Hornwood is a North Carolina corporation and is the majority member of Triangle. (Second Am. Compl. ¶ 16.) As members of Triangle, Emrich and Hornwood are also managers of Triangle for all purposes. (Second Am. Compl. Ex. 1, § 3.1, ECF No. 116.1 ["Op. Agreement"].)

7. Triangle, originally founded in 2006 by Emrich, Hornwood, and non-party Bondtex, Inc. ("Bondtex"), is a North Carolina limited liability company that supplies headliner fabric to automobile companies. (Op. Agreement 1, Second Am. Compl. ¶¶ 15, 23–25.) When Triangle was founded, its three members focused on pursuing business opportunities that involved supplying automotive headliner fabrics. (Second Am. Compl. ¶ 21.)

8. Bondtex eventually withdrew from Triangle in 2018. (*See* Second Am. Compl. ¶¶ 43, 45, 50.)

9. On 28 February 2006, Emrich, Hornwood, and Bondtex entered into an operating agreement to govern Triangle's operations (the "Operating Agreement"). (*See* Op. Agreement.)

10. Section 4.4 of the Operating Agreement provides that "[n]o Member may engage in or possess an interest in other business ventures of any nature or description, independently or with others, which are competitive with the activities of [Triangle], without first offering an interest in such activities to [Triangle] and each other Member." (Op. Agreement § 4.4.)

11. Section 8.1 of the Operating Agreements reads as follows:

---

would be admissible in evidence, and (3) shows affirmatively that the affiant is competent to testify to the matters stated therein.").

> *Restrictions on Transfer.* Without the prior written consent of a Majority in Interest of the Disinterested Members (which consent may be given or withheld in their sole discretion) . . . no Member may voluntarily or involuntarily Transfer, or create or suffer to exist any Encumbrance against, all or any part of such Member's record or beneficial interest in the Company.

(Op. Agreement § 8.1 (emphasis in original).) Section 2 of the Operating Agreement defines "Transfer" as to "sell, assign, transfer, lease, or otherwise dispose of property, including without limitation, an interest in the Company." (Op. Agreement § 2.)

12. The Operating Agreement further provides that all decisions with respect to the management of the business and affairs of Triangle shall be made by action of a majority interest of the members. (Op. Agreement § 3.1.) The Operating Agreement does not address, either to create or disclaim, fiduciary duties. (*See* Op. Agreement.)

13. On 28 April 2006, Emrich, Hornwood, and Bondtex entered into a separate joint venture agreement (the "Joint Venture Agreement"). (Second Am. Compl. Ex. 2, ECF No. 116.2 ["Joint Venture Agreement"].)

14. Upon founding Triangle, Emrich, Hornwood, and Bondtex agreed to a division of responsibilities that were then documented in the Joint Venture Agreement. (Second Am. Compl. ¶ 30; Joint Venture Agree. § 5(d).) Hornwood assumed responsibility for the manufacturing of fabric, invoicing, and internal accounting. (Joint Venture Agreement § 5(d)1.) Bondtex assumed responsibility for the lamination, cutting, storage, and distribution of laminated product. (Joint Venture Agreement § 5(d)2.) Emrich assumed responsibility for the sales and

marketing of Triangle's products and customer service.[3]  (Joint Venture Agreement § 5(d)3.)

15.  Section 3(a) of the Joint Venture Agreement provides that "[e]ither party shall invoice the Joint Venture, with terms of 75 days, the cost it incurs in providing fabric, laminating, cutting and packaging for the completion of the services."  (Joint Venture Agreement § 3(a).)

## B.  **Bondtex Withdraws from Triangle**

16.  In 2015, Triangle sued one of its former sales agents, Suminoe Textile America ("Suminoe") for alleged misconduct (the "Bondtex Lawsuit").  (Second Am. Compl. ¶ 43.)  Before the initiation of the lawsuit, Suminoe acquired ownership of Bondtex.  (Second Am. Compl. ¶ 43.)  In September 2018, the Bondtex Lawsuit was settled.  (Second Am. Compl. ¶ 45.)  As part of the settlement, Emrich and Hornwood consented to Bondtex's withdrawal from Triangle.  (Second Am. Compl. ¶ 50.)  Triangle received significant cash proceeds from the settlement.  (Second Am. Compl. ¶ 205, C. Horne Dep. 14:12–18, ECF No. 147.3.)

17.  After Bondtex withdrew from Triangle, Emrich and Hornwood, as the two remaining members of Triangle, hired C.H. Mueller ("Mueller") as a contract laminator to perform lamination services that had previously been performed by Bondtex.  (Second Am. Compl. ¶ 53.)  Additionally, Hornwood began to perform

---

[3] Although the Joint Venture Agreement made Emrich responsible for Triangle's customer service, prior to its withdrawal, Bondtex apparently handled customer service for Triangle until Bondtex's departure from Triangle.  (*See* Second Am. Compl. ¶¶ 30, 52; C. Horne Dep. 11:25–12:4, ECF No. 34.1.)

Triangle's customer-service responsibilities that had previously been performed by Bondtex. (Second Am. Compl. ¶¶ 30, 52.)

18. At Triangle's formation, the Operating and Joint Venture Agreements provided that Triangle would pay Emrich a commission of three to five percent on Triangle's sales. (Second Am. Compl. ¶ 131.) In January 2013, the parties agreed to adjust Emrich's commission to two percent. (Second Am. Compl. ¶ 132.)

19. After the settlement of the Bondtex Lawsuit, John Emrich, a principal of Emrich, suggested to Chuck Horne, Hornwood's CEO, that Triangle approach Borgstena[4] regarding a possible joint development, sales, and supply agreement between the two entities. (Second Am. Compl. ¶¶ 10, 90.) In September 2018, Chuck Horne emailed Borgstena regarding this potential agreement; however, Borgstena declined the offer. (Second Am. Compl. ¶ 90.)

C. **Hornwood's Involvement with Borgstena**

20. Unbeknownst to Emrich, a year earlier, in September 2017, Borgstena had contacted Chuck Horne to discuss the possibility of Hornwood making seating and headliner fabric in the United States for a major automobile manufacturer. (Second Am. Compl. ¶ 77.) In pursuit of such a relationship, and without notice to Emrich, Chuck Horne emailed Borgstena a "company profile" for Hornwood. (Second Am. Compl. ¶ 77.)

---

[4] Borgstena is a foreign manufacturer and seller of automotive textile products for suppliers of major automobile manufacturers. (Second Am. Compl. ¶ 76.) Prior to the relevant period, Borgstena had no presence in the United States.

21. In furtherance of a potential relationship, in November 2017, Hornwood and Borgstena executed a nondisclosure agreement so that they could negotiate an agreement for joint product development. (Second Am. Compl. ¶ 78.) Hornwood did not alert Emrich about the existence of the nondisclosure agreement or Hornwood's discussions with Borgstena. (Second Am. Compl. ¶ 78.)

22. In February 2018, Chuck Horne and his son Wesley Horne[5] visited Borgstena's manufacturing facility in Portugal. (Second Am. Compl. ¶ 83.) Neither the Hornes, nor Borgstena notified Emrich that such a meeting was taking place, and the Hornes did not invite anyone from Emrich to accompany them on the trip. (Second Am. Compl. ¶ 81.)

23. After the Hornes' meeting in Portugal with Borgstena personnel, Hornwood and Borgstena representatives engaged in weekly discussions regarding potential joint product-development. (Second Am. Compl. ¶ 83.)

24. In May 2018, Borgstena representatives came to North Carolina and met with the Hornes at Hornwood's facility. (Second Am. Compl ¶ 83.) Again, no one from Hornwood told anyone from Emrich about the meeting prior to or at the time it occurred. (Second Am. Compl. ¶ 83.)

25. During their meeting, Hornwood and Borgstena discussed the possibility of Hornwood manufacturing automotive textile products for two automobile manufacturers with whom Borgstena had a relationship. (Second Am. Compl. ¶ 84.) Later, in January 2019, Hornwood told Borgstena about an opportunity for the two

---

[5] Wesley Horne is the President of Hornwood. (W. Horne Aff. ¶ 1, ECF No 177.)

manufacturers to jointly purchase a textile plant in North Carolina. (Second Am. Compl. ¶ 93.)

26. Hornwood's product-development efforts with Borgstena involved the same types of fabrics that Hornwood manufactures for Triangle, including the manufacturing of warp-knit headliner and pillar fabrics. (Second Am. Compl. ¶¶ 101–02.) Until Hornwood produced discovery to Emrich in this action, Hornwood had not alerted Emrich of Hornwood's product-development efforts with Borgstena. (Second Am. Compl. ¶ 96.)

### D. The Mueller Transition

27. In the fall of 2018, Triangle began its transition from Bondtex to Mueller for Triangle's product lamination. (Second Am. Compl. ¶ 53.) Hornwood employee and customer service representative Scott Dutton ("Dutton") was selected by Hornwood to facilitate Triangle's transition. (Willis Aff. ¶¶ 19, 21, ECF No. 151.37.) In November 2018, Hornwood asked Triangle's sales agent Norman Willis ("Willis") not to communicate directly with Mueller and instructed him that Dutton should be the primary contact. (Willis Aff. ¶ 14; Triangle 30(b)(6) Dep. 232:23–25, ECF No. 151.7.)

28. At a 1 November 2018 meeting, Willis and representatives of Mueller expressed concerns to Hornwood regarding Dutton's ability to handle the transition from Bondtex to Mueller. (Willis Aff. ¶ 21.)

29.     Also on 1 November 2018, Dutton and Willis were informed via email that Dynevor Express,[6] a trucking company hired to ship Triangle's product, had not received necessary customs documents for a pending shipment of Triangle's product and that Dynevor Express would "need to receive these documents [at] latest by 9:00 am EST tomorrow Friday Nov 2nd to process and cross the [b]order[.]"  (Exs. to Br. Supp. Pl.'s Mot. Summ. J., Ex. 14, 4, ECF No. 151.14 ["Pl.'s Ex. 14"].)

30.     In email communications the following day, 2 November 2018, Chuck Horne informed Emrich that Dutton timely provided the customs documents after receiving notice of the issue.  (Pl.'s Ex. 14 at 2.)  Chuck Horne also indicated that the delay was not caused by Dutton, but instead was "totally caused by Bondtex," and described steps Dutton subsequently took to improve conveyance of shipping information in the future.  (Pl.'s Ex. 14 at 2.)

31.     During this period, Chuck and Wesley Horne conversed with Dutton to ensure he could competently handle his current workload.  (Hornwood 30(b)(6) Dep. 238:14–25, ECF No. 176.3.)  After December 2018, Chuck and Wesley Horne checked in with Dutton either daily or weekly to assess the status of Dutton's work for Triangle.  (Hornwood 30(b)(6) Dep. 239:15–23.)

---

[6] Dynevor Express provides cross-border general freight trucking services throughout Canada, Mexico, and the United States.  (Dynevor Express Profile, dynevorexpress.com/en/dynevor-express-profile.php (last visited Feb. 10, 2022).)

### E. The Members Discuss Emrich's Commissions

32. From Triangle's inception until June 2019, Emrich was paid a commission on all sales. (Joint Venture Agreement § 3(a); Triangle 30(b)(6) Dep. 114:20-116:17, ECF No. 151.7.)

33. Following Bondtex's withdrawal from Triangle, on 25 September 2018, Chuck Horne informed Emrich that his understanding was that, given the new ownership split, Emrich would no longer be receiving a commission. (Br. Supp. Defs.' Mot. Summ. J. Ex. 9, ECF No. 147.10 ["Defs.' Ex. 9"].) On 27 September 2019, John Emrich informed Chuck Horne that Emrich still wished to receive commissions, which could be offset against its share of Triangle's profits. (Defs.' Ex. 9.)

34. Chuck Horne and John Emrich exchanged emails on the subject of Emrich's commissions in February 2019. (Defs.' Ex. 16.) An email sent from John Emrich to Chuck Horne on 12 February 2019 referenced a new agreement between the parties beginning on 1 October 2018. (Defs.' Ex. 16.) In this 12 February 2019 email, John Emrich described the agreement as changing Triangle's profit sharing, eliminating Emrich's two percent commission, and treating any commissions paid from October through December 2018 as advances. (Defs.' Ex. 16.)

35. For approximately four months after 12 February 2019, until at least 11 June 2019, Triangle continued to account for commissions to Emrich on its books. (Triangle 30(b)(6) Dep. 114:20–116:17.)

## F. Hornwood Makes Unilateral Financial Decisions

36.     On 10 June 2019, Hornwood informed Emrich that, due to sustaining losses in its business with Triangle, Hornwood would be increasing the amount it charges Triangle for fabric manufacturing. (Br. Supp. Emrich Enter. Mot. Compel Resp. Doc. Req. Ex. 1, ECF No. 98.2 ["Hornwood Letter"].) Although Hornwood was raising its prices, Hornwood contended that it would still be charging Triangle below the market rate for its services. (Hornwood Letter ¶ 2.) Three days later, on 13 June 2019, Hornwood informed Emrich that Triangle would no longer pay commissions to Emrich. (Second Am. Compl. ¶ 10.)

## G. Loss of Freightliner and M2 Headliner Programs

37.     One of Triangle's customers, Commercial Vehicle Group ("CVG"), supplied headliner for Freightliner trucks. (Second Am. Compl. ¶ 61.) Triangle supplied CVG with headliner for certain Freightliner trucks (the "Freightliner program") and was working toward a new relationship supplying headliner for Freightliner M2 trucks (the "M2 program"). (Second Am. Compl. ¶ 61.) However, in late 2018, CVG reported quality issues with Triangle's headliner fabrics. (Second Am. Compl. ¶ 62.) In 2019, Freightliner's parent company, Daimler Trucks North America LLC, informed Triangle that Triangle would be required to pass quality testing by CVG (the "CVG trial") to retain the Freightliner program. (Second Am. Compl. ¶¶ 66–68.)

38.     The CVG trial required Triangle to submit samples of its laminated fabric to CVG for inspection. (Second Am. Compl. ¶ 67.) CVG required that the samples be submitted in a specific quantity, roll size, foam thickness, and contain fewer than five

fabric defects per roll. (Second Am. Compl. ¶ 69.) CVG communicated these specifications to Hornwood prior to the trial. (*See* Fenton Aff. ¶ 23, ECF No. 151.39.) Hornwood was tasked with communicating those specifications to Mueller before the fabric was submitted to CVG.[7] (*See* Fenton Aff. ¶ 27–28.)

39. In July 2019, CVG informed Triangle that the fabric Triangle submitted for the CVG trial did not comply with the specifications set by CVG and communicated to Triangle. (Second Am. Compl. ¶ 69.) Specifically, Triangle submitted less fabric, in smaller rolls, and with thinner foam than required. (Second Am. Compl. ¶ 69.) In addition, the laminated fabric provided by Triangle to CVG contained an excessive number of defects per roll. (Second Am. Compl. ¶ 70.) Consequently, following the testing, Triangle was informed that it lost the Freightliner program to competitor Guilford Performance Textiles ("Guilford") and that it was not chosen for the M2 program. (Second Am. Compl. ¶ 71.)

## H. **Hornwood Attempts to Withdraw from Triangle**

40. On 4 March 2019, Chuck Horne called a meeting of the members of Triangle. (Second Am. Compl. ¶ 105.) Chuck Horne and Wesley Horne attended the meeting on behalf of Hornwood, and John Emrich and Martha Miller ("Miller") attended the meeting on behalf of Emrich. (Second Am. Compl. ¶ 105.) Before the meeting, Chuck Horne and Wesley Horne presented John Emrich and Miller with a proposed new governing document for Triangle. (Second Am. Compl. ¶ 107.) John

---

[7] Whether Hornwood accurately conveyed to Mueller the specifications it received from CVG is a contested issue in this litigation.

Emrich and Miller did not agree to the terms of the proposed governing document and refused to execute it. (Second Am. Compl. ¶ 107.)

41. Also at the 4 March 2019 meeting, Hornwood informed Emrich of its intent to do business with Borgstena. (Second Am. Compl. ¶ 108.) Hornwood then offered to buy Emrich's membership interest in Triangle, or in the alternative, to sell Hornwood's membership interest in Triangle to Emrich. (Second Am. Compl. ¶¶ 109–10.)

42. At the conclusion of the 4 March 2019 meeting, Hornwood provided Emrich written notice of its intent to withdraw from Triangle in sixty days. (Second Am. Compl. ¶ 111; Second Am. Compl. Ex. 4, ECF No. 116.4 ["Notice to Withdraw"].)

43. On 25 April 2019, Hornwood sent an email to Emrich stating its intent to inform Triangle's customers of Hornwood's withdrawal. (Second Am. Compl. ¶ 122; Second Am. Compl. Ex. 8, ECF No. 116.8.)

44. Following the initiation of this litigation, on 31 May 2019, this Court preliminarily enjoined Hornwood, during the pendency of this action, from unilaterally withdrawing from Triangle without properly obtaining the consent of Emrich under Triangle's operating agreement. (*See* Or. Am. Mot. Prelim. Inj. ¶ 75, ECF No. 40.)

45. On 10 June 2019, Hornwood advised Emrich by letter that it was initiating an increase in the prices of fabric that Hornwood was then selling to Triangle. (Second Am. Compl. ¶ 9.) The 10 June 2019 letter stated that the price increases were required for Hornwood to remain financially viable. (Second Am. Compl. ¶ 141.)

46. Hornwood owns the facilities where Triangle's fabric is manufactured. (Second Am. Compl. ¶ 31.) Triangle does not own any physical assets other than its inventory. (Second Am. Compl. ¶ 31.) Emrich does not have manufacturing capabilities and cannot perform the functions that Hornwood (manufacturing), Bondtex (lamination), Mueller (lamination) or others performed for Triangle. (Second Am. Compl. ¶¶ 114, 118; Joint Venture Agreement § 5(d)1–3; Dep. of Wesley Horne and Chuck Horne 242:11-18, ECF No. 147.6.)

I. **Triangle's Cash Shortage**

47. Triangle has experienced a cash shortage since 1 November 2018. (McCaskill Aff. ¶ 15.) While Bondtex was a member of Triangle, Triangle did not have to purchase raw materials or hold inventory because Bondtex performed these functions. After Bondtex withdrew, however, Triangle had to cover these expenses. (McCaskill Aff. ¶ 15.) In 2019, Triangle's average accounts payable totaled $110,000 per month, while Triangle's average sales totaled $120,000 per month. (McCaskill Aff. ¶ 15.) As of May 2020, Triangle had over $180,000 in past due accounts payable and as of November 2020, it was experiencing net losses. (C. Horne Aff. ¶ 7, ECF No. 145.) In November 2020, Hornwood called for each of Triangle's members to contribute capital to Triangle to ensure Triangle retained sufficient cash to operate. (C. Horne Aff. ¶ 8.)

48. Emrich informed Hornwood that Emrich would not contribute capital, and Hornwood subsequently loaned $120,000 to Triangle to meet its ongoing expenses. (C. Horne Aff. ¶ 12.)

## J. Triangle's Accounts Receivable

49. Triangle's customers frequently did not pay invoices on time. (McCaskill Aff. ¶ 17.) If Triangle was not paid within sixty days of the invoice due date, Triangle's accountant would work with the appropriate customer contact to collect payment. (McCaskill Aff. ¶ 17.) In particular, Triangle customers CVG and Plasticoat often fell behind on payments to Triangle. (*See* Phipps Dep. 214:14, ECF No. 147.21, W. Horne Aff. ¶ 6, ECF No. 177.)

50. Hornwood made efforts to collect the amounts owed approximately "once or twice a month." (Phipps Dep. 214:14.) In February 2019, John Emrich and Donald Phipps ("Phipps"), an Emrich employee, worked with CVG to implement a new invoicing system for better flow of payments from CVG to Triangle. (Emrich 13 Aug 2020 Dep. 238:19–239:25., ECF No. 147.8, Phipps Dep. 214:15–18.)

51. By 14 September 2020, Triangle customer Plasticoat owed Triangle $85,000 in past-due receivables. (Emrich Decl. Ex. 8, at 1, ECF No. 151.40.) On 16 September 2020, John Emrich contacted Hornwood's Treasurer, Paula McCaskill, to ask why these past-due receivables had not been collected. (W. Horne Aff. ¶ 6.) Paula McCaskill worked with Plasticoat and Willis to collect the past-due receivables, Hornwood informed John Emrich of Hornwood's ongoing efforts to collect the receivables, and Triangle received the past-due amount of $85,000.00 from Plasticoat on 30 September 2020. (W. Horne Aff. ¶ 6, Exs. B–D.)

### K. Triangle's Accounting and Tax Records

52. On 16 October 2018, Triangle's members agreed to distribute a portion of its 2018 third quarter profits, as well as proceeds from the Bondtex Lawsuit settlement. (McCaskill Aff. ¶ 11.) Triangle distributed $2,010,200.00 to Hornwood and $1,789,800.00 to Emrich. (McCaskill Aff. ¶ 11.) However, $25,644.96 in advance distributions Emrich received during the third quarter of 2018 was deducted from its distribution reducing the amount it received to $1,764,155.04. (McCaskill Aff. ¶ 11.)

53. Hornwood, with Triangle's accountant, coordinated the preparation of Triangle's 2019 tax forms. (Second Am. Compl. ¶ 160.) During the 2018–19 accounting period, Triangle issued payments to Emrich using checks stating that the funds were for "commissions." (Second Am. Compl. ¶ 161.) As late as March 2019, Emrich still had not received a Form 1099 or other tax form from Triangle. (Second Am. Compl. ¶ 162.) On 31 March 2019, Triangle's accountant sent Emrich a Schedule K-1 but indicated that Triangle would not be sending Emrich a Form 1099 form for the period. (Second Am. Compl. ¶ 162.)

54. Thereafter, for a period of time monthly payments made to Emrich continued to be labeled as commission payments in Triangle's computer system. (McCaskill Aff. ¶ 13, ECF No. 150.) However, Hornwood eventually changed the bookkeeping system to classify the monthly payments to Emrich as advanced distributions. (McCaskill Aff. ¶ 13.) By 17 December 2020, Triangle had begun sending revised tax documents to Triangle's members reflecting the reclassification. (McCaskill Aff. ¶ 14.)

## III. PROCEDURAL BACKGROUND

55. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

56. This action was originally initiated by Emrich on 29 April 2019 with the filing of its Verified Complaint. (ECF No. 3.)

57. On 1 May 2019, this Court issued a Temporary Restraining Order ("TRO") enjoining Hornwood from, among other things, withdrawing as a member of Triangle. (ECF No. 15.)

58. On 21 May 2019, Emrich filed its Amended Motion for Preliminary Injunction seeking to extend the TRO throughout the pendency of this action. (ECF No. 27.)

59. As noted previously at ¶ 44, *supra*, on 31 May 2019, the Court granted in part Emrich's Amended Motion for Preliminary Injunction and enjoined Hornwood from unilaterally withdrawing from Triangle without consent from Emrich. (Order on Am. Mot. for Prelim. Inj. ¶ 75, ECF No. 40.)

60. On 4 August 2020, Emrich filed its Second Amended Verified Complaint (the "Complaint"). (ECF No. 116.)

61. Defendants filed their Answer to Second Amended Complaint, Affirmative Defenses, and Restated Counterclaim on 8 September 2020 (the "Counterclaim"). (Answer Second Am. Compl., Affirmative Defenses, & Restated Countercl., ECF No. 127 ["Countercl."].) On 8 October 2020, Emrich filed Emrich's Reply to Triangle's Restated Counterclaim. (ECF No. 132.)

62.     On 18 December 2020, Emrich filed its Motion for Summary Judgment and supporting brief.  (Br. Supp. Emrich's Mot. Summ. J., ECF No. 143 ["Br. Supp. Emrich Mot."].)  Triangle filed its responsive brief on 20 January 2021.  (Triangle Auto. Components., LLC's Br. Opp. Pl.'s Mot. Summ. J., ECF No. 169 ["Triangle Br. Opp."].)  Emrich filed its reply brief on 1 February 2021. (ECF No. 175.)

63.     Also on 18 December 2020, Defendants filed Defendants' Motion for Summary Judgment and supporting brief.  (Br. Supp. Defs.' Mot. Summ. J., ECF No. 147 ["Br. Supp."].)  On 20 January 2021, Emrich filed its response brief, (Emrich Resp. Defs.' Mot. Summ. J., ECF No. 166 ["Emrich Resp."]), and Defendants filed their Reply Brief on 1 February 2021, (ECF No. 176).

64.     The Court held a hearing on the Motions on 20 April 2021.  (*See* ECF No. 185.)

65.     The Motions are ripe for resolution.

## IV.    LEGAL STANDARD

66.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C.G.S. § 1A-1, Rule 56(c).  "A 'genuine issue' is one that can be maintained by substantial evidence."  *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

67.     The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.

*Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

68. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

69. The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83. However, the nonmovant "may not rest upon the mere allegations or denials of their pleading, but their response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

## V.    ANALYSIS

70. The Court first addresses Plaintiff's Motion, then turns to Defendants' Motion.

## A.     Plaintiff's Motion

71.     Triangle asserts one counterclaim for relief against Emrich alleging that Emrich breached a fiduciary duty owed as a member to Triangle by initiating the lawsuit. (Countercl. ¶ 63.) Emrich contends that it is entitled to summary judgment on Triangle's breach of fiduciary duty claim because: (1) Triangle cannot prove the elements of its breach of fiduciary duty claim; and (2) the imposition of liability against Emrich for a breach of a fiduciary duty based on the filing of this lawsuit would violate the Petition Clause of the First Amendment to the United States Constitution and Article I, Section 12 of the North Carolina Constitution. (Pl.'s Br. Supp. Mot. 3.)

72.     Emrich is a member of Triangle, but members of an LLC generally do not owe the LLC a fiduciary duty. *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469 (2009) ("Members of a limited liability company . . . do not owe a fiduciary duty to each other or to the company."). While there are exceptions to this general rule, none apply to Emrich. *Cf. Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *9 (N.C. Super. Ct. Mar. 9, 2016) ("[A] holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members."). As a result, Hornwood has failed to demonstrate a triable issue of fact that Emrich breached a fiduciary duty to Triangle by bringing suit.

73.     Additionally, Triangle's counterclaim is deficient for another and more fundamental reason. The First Amendment prohibits Congress from "abridging . . . the right of the people . . . to petition the Government for a redress of grievances."

U.S. Const. amend. I. Similarly, Article I, Section 12 of the North Carolina Constitution protects the right to petition. N.C. Const. art. I, § 12.

74. The Supreme Court's decision in *Cheryl Lloyd Humphrey Land Inv. Co. v. Resco Products, Inc.*, 377 N.C. 384 (2021), is dispositive here. There, the Court recognized that the right to petition for redress is a fundamental one, and "[p]rotecting the right to petition requires early dismissal of lawsuits that impermissibly seek to infringe on the right and thus chill petitioning activity occurring in these political contexts." *Id.* at 389-90. Accordingly, "[w]hen a lawsuit is premised on a party's petition activity, the First Amendment and Article I, Section 12 mandate early dismissal." *Id.* at 390. "[F]iling a complaint in court is a form of petitioning activity." *McDonald v. Smith*, 472 U.S. 479, 484 (1985). And while "baseless litigation is not immunized by the First Amendment right to petition[,]" as determined below, Plaintiff's complaint is far from baseless. *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U.S. 731, 743 (1983).

75. Triangle's counterclaim for breach of fiduciary duty is entirely premised on Emrich initiating this lawsuit. The Court concludes that the pursuit by Emrich of this claim is the sort of petitioning activity that is protected by the First Amendment to the United States Constitution and Article I, Section 12 of the North Carolina Constitution. Therefore, Plaintiff's Motion is **GRANTED**, and Defendants' breach of fiduciary duty claim is **DISMISSED** with prejudice.

## B.    Defendants' Motion

Emrich brings both direct claims against Hornwood and Triangle and claims that are derivative in nature on behalf of Triangle against Hornwood that are premised on Hornwood's alleged misconduct. Defendants request that the Court grant summary judgment as to Emrich's claims for: (1) breach of contract against Hornwood; (2) breach of fiduciary duty against Hornwood; and (3) breach of contract against Triangle.

### 1.    Breach of Contract Claims Against Hornwood

76. Emrich asserts three separate claims for breach of contract against Hornwood. A party asserting a breach of contract claim must show "(1) existence of a valid contract; and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000). "When language of a contract is plain and unambiguous its construction is a matter of law for the court." *De Torre v. Shell Oil Co.*, 84 N.C. App. 501, 504 (1987). "However, if the court determines that the terms of the contract are ambiguous and resort to extrinsic evidence is necessary then the question of construction of the contract is one for the jury." *Frye Reg'l Med. Ctr., Inc. v. Blue Cross Blue Shield N.C., Inc.*, 2020 NCBC LEXIS 51, at *28 (N.C. Super. Ct. Apr. 17, 2020) (cleaned up). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, 362 N.C. 269, 273 (2008) (citation omitted). Here, the parties dispute whether Hornwood breached

Sections 4.4 and 8.1 of the Operating Agreement and Section 3 of the Joint Venture Agreement.

*a. Section 4.4 of the Operating Agreement*

77. Emrich's first claim for relief is asserted against Hornwood, individually and derivatively on behalf of Triangle, for breach of Section 4.4 of the Operating Agreement. (Second Am. Compl. ¶¶ 167–74.) Section 4.4 of the Operating Agreement states that "[n]o Member may engage in or possess an interest in other business ventures of any nature or description, independently or with others, which are competitive with the activities of [Triangle] without first offering an interest in such activities to [Triangle] and each other Member." (Defs.' Ex. 25; Op. Agreement § 4.4.) The Operating Agreement entered into by Emrich and Hornwood, along with Bondtex, on 28 February 2006, sets forth that its term lasts "until the Company is dissolved and its affairs wound up in accordance with the provisions of this Agreement or the [North Carolina Limited Liability Company] Act." (Op. Agreement ¶ 1.6.) The Operating Agreement does not specifically define or elaborate on what activities may be considered "competitive with the activities" of Triangle. (*See* Op. Agreement ¶ 4.4.)

78. Emrich contends that Hornwood breached Section 4.4 of the Operating Agreement by working with Borgstena. (Second Am. Compl. ¶¶ 169–174.) Defendants counter that "[b]ecause Triangle's activities within the automotive industry are limited to supplying and selling finished, laminated products

(headliners), it is reasonable to interpret 'competitive activities' within Section 4.4 to only encompass those specific activities." (Br. Supp. Defs.' Mot. 15.)

79. The Court concludes, based on the evidence before it, that Section 4.4 is susceptible to multiple reasonable interpretations, including the parties' respective interpretations.

80. Defendants argue that Triangle's purpose is to "supply laminated warp knit fabrics for use in headliner, pillar and post, visor and package shelf applications." (Br. Supp. Defs.' Mot. Ex. 26, ECF No. 147.27.) It is undisputed that, during Chuck Horne's February 2018 visit to Borgstena's facilities, Hornwood agreed to duplicate fabric Borgstena uses in its automotive products. (Chuck Horne Dep. 39:17–21.) It is also undisputed that Hornwood's product-development efforts with Borgstena involve the same types of fabrics that Hornwood manufactures for Triangle, including the manufacturing of warp-knit headliner and pillar fabrics. (Second Am. Compl. ¶¶ 101–02.) The record indicates that Borgstena considered building a laminating facility of its own. (Chuck Horne Dep. 34:11–12.) However, since neither Hornwood nor Borgstena had in-house lamination capabilities, it is not clear from the record whether Hornwood, in collaboration with Borgstena, intended to supply *laminated* warp knit fabrics for use in headliner, pillar and post, visor and package shelf applications. It is ultimately a question for the jury whether Hornwood's conduct fell within the meaning of "competitive activities."

81. In sum, the Court is unable to determine the intent behind and properly interpret Section 4.4 of the Operating Agreement without consideration of extrinsic

evidence which is conflicting, making summary judgment inappropriate as to this claim.

82.     Defendants also contend that Emrich's "purported interpretation [of Operating Agreement Section 4.4] is an unenforceable restraint on trade." (Br. Supp. Defs.' Mot. 18.)   "The reasonableness of a restraining covenant is a matter of law for the court to decide." *Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663 (1968).   In arguing that Plaintiff's interpretation is an unenforceable restraint on trade, Defendants draw support from cases analyzing post-termination restrictions.   *See Sandhills Home Care, L.L.C., v. Companion Home Care–Unimed, Inc.*, 2016 NCBC LEXIS 61, at *20 (N.C. Super. Ct. Aug 1, 2016) (restricting competitive activities for one year following termination of employment); *Outdoor Lighting Perspectives Franchising v. Harders*, 228 N.C. App. 613, 623 (2013) (restricting competitive activities for two years following termination of the franchise agreement); *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 565 (2014) (restricting competitive activities for eighteen months after the end of employment).

83.     Section 4.4 is distinguishable from the provisions at issue in the cases on which Defendants rely.   First, Section 4.4 contains no post-termination restriction and thus applies only to members while they are still part of Triangle.   Second, Section 4.4 is not an absolute prohibition on competitive activities by members. Instead, it permits members to engage in competitive activities provided that Triangle and each member of Triangle are "first offer[ed] an interest in such activities[.]"   (Op. Agreement § 4.4.)   In effect, Section 4.4 is better understood as

imposing a limited duty of loyalty on Triangle's members, rather than as a non-compete provision.

84. Therefore, the Court **DENIES** Defendants' Motion to the extent Defendants request summary judgment as to Emrich's claim for breach of Section 4.4 of the Operating Agreement.

*b. Section 8.1 of the Operating Agreement*

85. Emrich's second claim for relief is asserted against Hornwood, individually and derivatively on behalf of Triangle, for breach of Section 8.1 of the Operating Agreement. (Second Am. Compl. ¶¶ 183–190.) It is Emrich's position that the Operating Agreement prohibits a member from unilaterally withdrawing from Triangle. (Second Am. Compl. ¶ 184.)

86. Section 8.1 of the Operating Agreements reads as follows:

*Restrictions on Transfer.* Without the prior written consent of a Majority in Interest of the Disinterested Members (which consent may be given or withheld in their sole discretion) . . . no Member may voluntarily or involuntarily Transfer, or create or suffer to exist any Encumbrance against, all or any part of such Member's record or beneficial interest in the Company.

(Operating Agreement § 8.1 (emphasis in original).) Section 2 of the Operating Agreement defines "Transfer" as to "sell, assign, transfer, lease, or otherwise dispose of property, including without limitation, an interest in the Company." (Operating Agreement § 2.)

87. Hornwood contends that "Hornwood did not breach Section 8.1 of the Operating Agreement because it does not prohibit a member from unilaterally withdrawing." (Br. Supp. Defs.' Mot. 20.) It is Hornwood's position that "Transfer,"

as defined by the Operating Agreement, does not include a member's withdrawal. (Br. Supp. Defs.' Mot. 20–22.) Hornwood's proposed definition of "Transfer" is "the act of giving something to another entity or person." (Br. Supp. Defs.' Mot. 21.) In other words, Hornwood contends that its withdrawal from Triangle does not constitute a "Transfer" within the meaning of the Operating Agreement because Hornwood would only be removing itself from Triangle, not giving its interest to another person or entity. (Br. Supp. Defs.' Mot. 21.)

88. Hornwood further cites to Section 9 of the Operating Agreement, which defines a "Buy-Sell Event" as "[a]ny purported voluntary or involuntary Transfer or Encumbrance of all or any part of a Member's Membership Interest in a manner not expressly permitted by this Agreement" or "[a]ny withdrawal by a Member from [Triangle] other than as may be expressly permitted by this Agreement." (Operating Agreement § 9.1 (d), (g).) Hornwood contends that Section 9's use of the word "withdrawal," separately from its use of the word "Transfer", requires the Court to reach the conclusion that a Transfer does not include a withdrawal. (Br. Supp. Defs.' Mot. 22–23.)

89. The Court declines to disregard the express choice of the words "dispose of" in the Operating Agreement's definition of "Transfer," which could reasonably include Hornwood's withdrawal from Triangle. In fact, it is Chuck Horne's position that Hornwood's attempt to withdraw was to "give up," or otherwise dispose of, Hornwood's financial interest in Triangle. (Chuck Horne Dep. 25:24–26:6.)

90.     The Court is in no way concluding that Hornwood's interpretation is unreasonable or incorrect as a matter of law.  However, at best, the terms of the Operating Agreement, specifically the use of the word "Transfer" in Section 8.1, are susceptible to multiple reasonable interpretations, making summary judgment inappropriate as to this claim.

91.     Defendants then contend that, even if the Court concludes that Hornwood breached Section 8.1 of the Operating Agreement, the remedy Plaintiff seeks violates public policy and is unavailable under the Operating Agreement.  (Br. Supp. Defs.' Mot. 23–24.)  Emrich requests compensatory damages and "permanent injunctive relief prohibiting Hornwood from unilaterally withdrawing from Triangle[.]" (Second Am. Compl. ¶ 192.)  It is Hornwood's interpretation of the Second Amended Complaint that Emrich "seeks a judgment requiring Hornwood to remain an active member of Triangle *forever*." (Br. Supp. Defs.' Mot. 20 (emphasis in original).)

92.     As an initial matter, it is unclear to the Court on what basis compensatory damages would violate public policy and Defendants do not cite to any case in support of this proposition.  Therefore, the Court **DENIES** Defendants' request for summary judgment as to any compensatory damages stemming from Hornwood's alleged breach of Section 8.1 of the Operating Agreement.

93.     As to Defendants' position that Emrich seeks injunctive relief prohibiting Hornwood from withdrawing from Triangle for an indefinite period of time, it is not clear to the Court that this is Emrich's request.  As noted by Emrich, Hornwood may seek to withdraw from Triangle in compliance with the terms of the Operating

Agreement, as long as it is not in violation of this Court's orders, or it may seek relief pursuant to North Carolina statutes. (*See* Resp. Br. Defs.' Mot. 16–7.) In this regard, the Court notes that the Operating Agreement, voluntarily agreed to by Hornwood at the inception of the venture, has a defined term and a termination date. (*See* Op. Agreement ¶ 1.6.)

94. In any event, based on the record before it, the Court believes it premature to analyze the public policy ramifications of a remedy to which Emrich may or may not be entitled.

95. The Court therefore **DENIES** Defendants' Motion to the extent Defendants request summary judgment as to Emrich's claim for breach of Section 8.1 of the Operating Agreement.

*c. Agreement to Manufacture Fabric for Triangle at Cost*

96. Emrich's sixth claim for relief is asserted against Hornwood, individually and derivatively on behalf of Triangle, for Hornwood's alleged violation of the Joint Venture Agreement by refusing to manufacture fabric for Triangle at its cost. (Second Am. Compl. ¶¶ 227–35.)

97. Section 3(a) of the Joint Venture Agreement provides "[e]ither party shall invoice [Triangle], with terms of 75 days, the cost it incurs in providing fabrics, laminating, cutting and packaging for the completion of services. . . . All parties shall mutually agree upon additional expenses." (Joint Venture Agreement § 3(a).)

98. Defendants contend that it is undisputed that Hornwood did not breach Section 3(a) of the Joint Venture Agreement because Hornwood's price increase

reflected only the increased costs of general and administrative expenses. (Br. Supp. Defs.' Mot. 24–25.)

99. The Joint Venture Agreement neither expressly addresses general and administrative expenses in Section 3(a) nor otherwise defines "cost." Defendants rely in part on the Black's Law Dictionary definition of "Manufacturing Cost," which includes the cost of general and administrative activities. (Br. Supp. Defs.' Mot. 24.)

100. The original arrangement between Hornwood, Bondtex, and Emrich was for Hornwood to manufacture fabric and Bondtex to laminate the fabric with "no general and administrative expenses included[.]" (Chuck Horne Dep. 23:2–9, ECF No. 147.3.) Hornwood did not charge Triangle for general or administrative expenses from 2010 until 2018. (Hornwood 30(b)(6) Dep. 80:21–81:2, ECF 147.15.)

101. The Joint Venture Agreement's use of the word "cost" could reasonably encompass general or administrative expenses associated with Hornwood "providing fabric" to Triangle. On the other hand, the Joint Venture Agreement could reasonably be construed to be limited to the costs directly incurred in the manufacturing process of the fabric. Based on the record before it, the Court is unable to resolve the interpretation of Section 3(a) without consideration of extrinsic evidence, making summary judgment inappropriate.

102. Accordingly, the Court **DENIES** Defendants' Motion to the extent Defendants request summary judgment as to Emrich's claim for breach of Section 3(a) of the Joint Venture Agreement.

### d. Distribution of Settlement Proceeds

103. Emrich's fourth claim for relief is asserted directly against Triangle for Triangle's alleged failure to pay Emrich its portion of settlement proceeds from the Bondtex Lawsuit. (Second Am. Compl. ¶¶ 205–12.) Emrich alleges, and Defendants deny, that Emrich and Defendants agreed that Triangle would distribute approximately seventy-eight percent of Emrich's share of the settlement proceeds from the Bondtex lawsuit in October 2018, and the remainder at the end of 2018. (*See* Second Am. Compl. ¶ 206.) It is undisputed that Triangle distributed seventy-eight percent of Emrich's share of the proceeds to Emrich in October 2018. (Second Am. Compl. ¶ 207.) However, Emrich contends that Triangle breached the agreement regarding the payment and distribution of the proceeds by failing to distribute the remainder of Emrich's share at the end of 2018. (Second Am. Compl. ¶ 208.)

104. It is Defendants' position that there is no enforceable agreement to distribute the settlement proceeds at the end of 2018. (Br. Supp. Defs.' Mot. 25.) The record reveals that the parties agreed to "set aside" the remaining twenty-two percent of the settlement proceeds when seventy-eight percent was distributed to Emrich and Hornwood, (Emrich Dep. 111:1–3, ECF No 147.8, Br. Supp. Defs.' Mot. Sum. J. Ex. 17, 2, ECF No. 147.18), and Hornwood contends that the agreement to set aside the remainder of the settlement proceeds was made to ensure Triangle retained enough

cash to operate. (*See* Emrich Dep. 111:6–7.) There is also evidence that on 16 October 2018, Chuck Horne and John Emrich "agreed to hold back $200,000 in reserve until year end." (Br. Supp. Defs.' Mot. Ex. 11, ECF No. 147.12.) On 10 April 2019, Chuck Horne again affirmed that he and John Emrich previously "agreed to set aside part of the settlement money[.]" (Br. Supp. Defs.' Mot. Summ. J. Ex. 17, 2.). Thus, the agreement to "hold back" the remaining twenty-two percent of the settlement proceeds "until year end" may be reasonably construed as an agreement to distribute the proceeds at year end.

105. However, since Triangle's cash shortage apparently motivated the decision to withhold twenty-two percent of the settlement proceeds, the 16 October 2018 communication may also be reasonably construed as an agreement to revisit Triangle's financial condition at the end of the year, and after doing so, to consider the propriety of making additional cash distributions. There is record evidence to support this interpretation.

106. "[W]hen an agreement is ambiguous and the intention of the parties is unclear, interpretation of the contract is for the trier of fact." *Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 266 (2006). Viewing the evidence in the light most favorable to Emrich as the non-movant, the record fails to establish the non-existence of an enforceable agreement to distribute the remaining settlement proceeds at the end of 2018. It is for a jury to determine the meaning of the 16 October 2018 communication.

107. Accordingly, the Court concludes that Defendants' Motion should be **DENIED** as to Emrich's breach of contract claim against Triangle regarding the distribution of settlement proceeds.

*e. Emrich's Sales Commission*

108. Emrich's fifth claim for relief is asserted against directly Triangle for Triangle's alleged failure to pay Emrich a sales commission owed to it pursuant to the terms of the Joint Venture Agreement. (Second Am. Compl. ¶¶ 215–23.)

109. Section 3(a) of the Joint Venture Agreement provides that "[s]elling expenses shall be paid on a commission basis[.]" (Joint Venture Agreement § 3(a).) The record before the Court reflects that, from inception until June 2019, Emrich was paid a commission on all sales. (Joint Venture Agreement § 3(a); Triangle 30(b)(6) Dep. 114:20–116:17, ECF No. 151.7.)

110. Following Bondtex's withdrawal from Triangle, Chuck Horne and John Emrich began negotiating a change in the percentages of their respective ownership of Triangle. (Second Am. Compl. ¶ 218.) On 25 September 2018, Chuck Horne expressed that his understanding of the agreement for a new ownership split was that Emrich would no longer receive a commission. (Defs.' Ex. 9.) However, just two days later, on 27 September 2018, John Emrich expressed that Emrich still wanted to receive commissions, which could be offset against periodic distributions to Emrich of its share of Triangle's profits. (Defs.' Ex. 9.)

111. Triangle points to a series of emails exchanged between Chuck Horne and John Emrich in February 2019. (Defs.' Ex. 16.) An email sent from John Emrich to

Chuck Horne on 12 February 2019 references a new agreement between the parties beginning on 1 October 2018. (Defs.' Ex. 16.) In this 12 February 2019 email, John Emrich describes the agreement as changing Triangle's profit sharing, eliminating Emrich's two percent commission, and treating any commissions paid from October through December 2018 as advances. (Defs.' Ex. 16.)

112. Emrich responds that, although the parties began negotiating new terms relating to Triangle's operation following Bondtex's departure, they "never memorialized any modification in writing[.]" (Emrich Enter. LLC's Resp. to Defs.' Mot. for Summ. J. 24, ECF No. 166 ["Emrich Resp."].)

113. While Defendants dispute the formation of an agreement as contended by Emrich, the record before the Court indicates that, following these email communications, until at least 11 June 2019, Triangle continued to pay Emrich at the rate of two percent of sales and account for such payments to Emrich as commissions on its books. (Triangle 30(b)(6) Dep. 114:20–116:17.) Hornwood was responsible for maintaining the financial books and records, including the classification of the payments to Emrich. (*See* McCaskill Aff. ¶ 3.) The evidence further reflects that, on 13 June 2019, Hornwood unilaterally advised Emrich that it would no longer be paid a sales commission. (Emrich Resp. Ex. 14, ECF No. 166.15.)

114. The Court concludes that, as to this claim, there are material facts in dispute. Therefore, the Court **DENIES** Defendants' Motion as to Emrich's fifth claim for relief.

## 2. Breach of Fiduciary Duty Claims Against Hornwood

115. Emrich's third and seventh claims for relief are asserted against Hornwood both directly and derivatively on behalf of Triangle, for breach of fiduciary duty. (Second Am. Compl. ¶¶ 193–203; 238–45.) In a nutshell, Emrich contends that Hornwood breached its fiduciary duties owed derivatively to Triangle and directly to Emrich in several respects, including by: (1) surreptitiously entering into a joint venture agreement with Borgstena to compete directly with Triangle; (2) threatening to cease manufacturing and to unilaterally withdraw from Triangle; (3) mismanaging the transition from Bondtex to Mueller for fabric lamination; (4) failing to properly address quality control issues with the Freightliner program; (5) unjustifiably increasing the price it charged Triangle for fabric; (6) preventing settlement proceeds from being paid to Emrich; (7) failing to act reasonably to collect Triangle's past-due accounts receivable; (8) ceasing to make advanced payments to Emrich; and (9) mischaracterizing income in Triangle's accounting and tax records.

116. Defendants contend that Hornwood does not owe fiduciary duties directly to Emrich because Hornwood lacks requisite control over Triangle. Hornwood further contends that the business judgment rule, economic loss rule, and proximate cause issues bar claims three, four, and seven through nine by Emrich. The Court will address each of Defendants' contention in turn.

a. Hornwood's Control of Triangle

117. "The North Carolina Limited Liability Company Act does not create fiduciary duties among members." *Finkel v. Palm Park, Inc.*, 2019 NCBC LEXIS 38,

at *23 (N.C. Super. Ct. June 11, 2019) (citation and quotation marks omitted). As a general rule, "[m]embers of a limited liability company are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company." *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473 (2009). "The rights and duties of LLC members are ordinarily governed by the company's operating agreement, not by general principles of fiduciary relationships." *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10–11 (N.C. Super. Ct. Aug. 7, 2017).

118. However, in some circumstances, "a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17 (N.C. Super. Ct. June 19, 2019). "Thus, when the operating agreement confers controlling authority on the majority member, [the majority member] owes a duty not to use its control to harm the minority, assuming no other provision disclaims such a duty." *Id.* at *21.

119. It is undisputed that Hornwood became the majority member of Triangle on 1 January 2018 when Bondtex's withdrawal became effective. (Defs.' Ex. 16 at 1.)

120. Defendants contend that "[t]here are no facts to demonstrate that Hornwood had the requisite control over Triangle[.]" (Br. Supp. Defs.' Mot. 32.) Emrich's position is that "abundant evidence shows that Hornwood controls Triangle, and thus owes fiduciary duties directly to Emrich Enterprises." (Resp. Defs.' Mot. 28.) The Court agrees with Emrich.

121. It is undisputed that Hornwood is the majority member of Triangle. (Second Am. Compl. ¶¶ 16.) Due to its status as a member of Triangle, Hornwood is "also a Manager of [Triangle] for all purposes." (Op. Agreement § 3.1.) It is further undisputed that Hornwood owned all of the manufacturing facilities where Triangle's products were manufactured and Emrich was not capable of manufacturing Triangle's products without Hornwood. (Second Am. Compl. ¶¶ 31–32.)

122. Furthermore, the Operating Agreement provides that "all decisions with respect to the management of the business and affairs of [Triangle] shall be made by action of a Majority Interest of the Members[.]" (Op. Agreement § 3.1.) The Operating Agreement does not address or disclaim fiduciary duties.

123. The undisputed evidence before the Court indicates that Hornwood acted unilaterally to decide financial issues of Triangle, including unilaterally deciding, and informing Emrich without debate, that Hornwood would increase the prices it charged Triangle for its production of fabric and that Emrich would no longer be paid a sales commission. Hornwood further controlled the bank account for Triangle.

124. Under these circumstances, the Court concludes that there is sufficient evidence to support Emrich's claim that Hornwood both served Triangle in a fiduciary capacity and owed fiduciary duties directly to Emrich.

b. The Business Judgment Rule

125. Defendants additionally contend that Hornwood's conduct and specifically that conduct that Emrich contends was improper is insulated under the business judgment rule. (Br. Supp. Defs.' Mot. 32.) Specifically, Defendants contend that a

presumption of good faith applies to Hornwood's management of (1) the CVG trials, (2) Triangle's transition to Mueller for lamination, (3) Triangle's accounting and tax records and (4) cash distributions to Triangle's members. (Br. Supp. Defs.' Mot. 33–35.) In each case, Defendants argue that there is no evidence that Hornwood acted unreasonably or in bad faith in its management decisions and that the record viewed in the light most favorable to Emrich is insufficient to rebut the business judgment rule's presumption of good faith.

126. In some instances, Managers of an LLC may be entitled to protections afforded by the business judgment rule. *Mooring Capital Fund, LLC v. Comstock N.C., LLC*, 2009 NCBC LEXIS 32, at *12 (N.C. Super. Ct. Nov. 13, 2009).

127. In North Carolina, the business judgment rule creates, first, an evidentiary presumption that in making a decision, the managers acted on an informed basis and in good faith in the honest belief that their decision was in the best interest of the LLC, and second, absent rebuttal of the initial presumption, the rule creates a powerful substantive presumption that a decision by a loyal and informed manager will not be overturned by a court unless it cannot be attributed to any rational business purpose. *See Adum v. Albemarle Plantation Prop. Owners Ass'n*, 2021 NCBC LEXIS 6, at *38–39 (N.C. Super. Ct. Jan. 19, 2021).

128. "A plaintiff may overcome the presumption with proof that [the manager] failed to act (1) in good faith, (2) in the honest belief that the action taken was in the best interest of the company or (3) on an informed basis." *Holland v. Warren*, 2020 NCBC LEXIS 146, at *31 (N.C. Super. Ct. Dec. 15, 2020) (cleaned up). Evidence that

a manager was inattentive, uninformed, acted in bad faith, or made a decision that is unreasonable may be considered in determining that the business judgment rule does not apply to protect alleged misdeeds. *See Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family L.P.*, 2007 NCBC LEXIS 7, at \*12 (N.C. Super. Ct. Mar. 5, 2007).

(1) The CVG Trials

129. Based on the evidence of record, the Court concludes that Hornwood's alleged failure to communicate the correct specifications to Mueller prior to the CVG trials is not the type of conduct protected by the business judgment rule. The business judgment rule recognizes that business decisions are best left in the hands of informed and experienced boards of directors and managers. Courts "are ill equipped to engage in post hoc substantive review of *business decisions." In re The Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746 (Del. Ch. 2005) (emphasis added). Business decisions "involve judgments by the board as to whether to enter into a course of conduct, generally one that creates new rights or obligations on behalf of the company. . . [and] involves weighing the risks and rewards of future conduct, which is the type of decision-making process the business judgment rule is designed to protect." *Tindall v. First Solar*, 892 F.3d 1043, 1047 (9th Cir. 2018).

130. By contrast, a ministerial act "involves obedience to instructions, but demands no special discretion, judgment or skill." *Ministerial*, Black's Law Dictionary (4th ed. 1951).

131. In the present case, the alleged tortious act by Hornwood through its agents regarding communication with Mueller about CVG's specifications and overseeing the manufacturing and delivery process was not a "business decision" as contemplated by the business judgment rule, but was instead in the nature of a ministerial act. Plaintiff's evidence tends to indicate that CVG sent Hornwood the trial specifications, and that Hornwood failed to accurately convey that information to Mueller, causing Triangle to submit samples to CVG in the wrong quantity with foam of the wrong thickness and with excessive fabric defects. (Second Am. Compl. ¶¶ 69–70; *see* Fenton Aff. ¶¶ 27–28.) Hornwood's communication to Mueller of CVG's specifications was a ministerial act that did not involve either judgment as to whether to enter into a course of conduct, or a weighing of the risks and rewards of future conduct. Likewise, the alleged failure to properly oversee manufacturing and quality assurance is similarly ministerial. This is not the type of situation where Hornwood's decisions and conduct are protected by the business judgment rule from critical review. Therefore, the Motion is **DENIED** to the extent it seeks dismissal of Emrich's breach of duty claim regarding the CVG trials.

(2) Triangle's Transition to Mueller

132. Emrich argues that Hornwood's reliance on Hornwood customer service representative Scott Dutton to perform certain tasks essential to the Mueller transition, and Hornwood's exclusion of Emrich and Norman Willis from communicating with Mueller constituted lack of attention, unreasonable decision-making, and a breach of loyalty. (Emrich Resp. 36–37.)

133. The record indicates that, at a 1 November 2018 meeting, Willis and representatives of Mueller expressed concerns to Hornwood regarding Hornwood employee Dutton's ability to handle the transition from Bondtex to Mueller, but that Chuck Horne expressed confidence in Dutton and kept him in charge of handling the Mueller transition. (Willis Aff. ¶ 19.)

134. The record indicates that Wesley Horne and Chuck Horne routinely checked-in with Dutton regarding his work for Triangle on the transition to Mueller. (Hornwood 30(b)(6) Dep. 238:14–25.)

135. There is an apparent dispute of fact over whether a 2 November 2018 shipment of Triangle's product was delayed, and, if so, whether it was the fault of Dutton. Emrich proffers the affidavit of Willis to state that a shipping delay occurred under the oversight of Dutton. (Willis Aff. ¶ 21.) Emails between John Emrich and Chuck Hornwood indicate that the shipment was not delayed. (Pl.'s Ex. 14 at 2, ECF No. 151.14.) However, this dispute is immaterial because regardless of whether or not a shipping delay occurred, the undisputed record also indicates that Mueller, and not Dutton, was responsible for the product shipments at issue. (*See* Pl.'s Ex. 14 at 2.)

136. The record indicates that Hornwood was attentive to Dutton's performance in his role for Triangle. Thus, Emrich has failed to provide sufficient evidence, at this stage, to suggest that Hornwood was inattentive, uninformed, acted in bad faith, or acted unreasonably.

137. The Court further concludes that the conduct at issue here is in the nature of conduct coming within the ambit of the business judgment rule. Plaintiff has failed to come forward with evidence rebutting the presumption arising under the rule. Therefore, except as set forth above in section b.(1), the Motion is **GRANTED** to the extent Defendants seek dismissal of Emrich's breach of duty claim regarding Hornwood's management of Triangle's transition to Mueller.

(3) Triangle's Accounting and Tax Records

138. Hornwood argues that the business judgment rule protects its management of Triangle's accounts receivable and that, even without application of the rule, there is no breach of duty because Hornwood kept regularly informed regarding the accounts receivable and took reasonable action to collect payment. (Defs.' Br. Supp. 35.) Plaintiff responds that Hornwood failed to properly collect Triangle's accounts receivable. (Emrich Resp. 37.)

139. The record contains evidence of Triangle's efforts to collect past-due receivables from Triangle customers CVG and Plasticoat. (*See* Phipps Dep. 214:14, W. Horne Aff. ¶ 6, ECF No. 177.) On several occasions, CVG fell behind on its payments to Triangle and Hornwood made efforts to collect the amounts owed approximately "once or twice a month." (Phipps Dep. 214:14.) In February 2019, John Emrich and Phipps worked with CVG to establish a better flow of payments from CVG to Triangle. (Emrich 13 Aug. 2020 Dep. 238:19–239:25., ECF No. 147.8.) Another Triangle customer, Plasticoat, owed Triangle $85,000 in past-due receivables as of 14 September 2020. (Emrich Decl. Ex. 8, 1.) On 16 September 2020, John

Emrich contacted Hornwood's Treasurer, Paula McCaskill, about the past-due receivables, and Triangle received full payment from Plasticoat two weeks later on 30 September 2020. (W. Horne Aff. ¶ 6, Exs. B–D.)

140. These facts are not sufficient to demonstrate that Defendants' actions were outside the realm of the business judgment rule, were improper, or caused Plaintiff harm. Therefore, the Motion is **GRANTED** to the extent Defendants seek dismissal of Emrich's breach of duty claim regarding management of Triangle's accounts receivable.

141. Hornwood also argues that the business judgment rule protects its management of Triangle's tax records. Emrich contends that Hornwood caused Emrich's tax forms to erroneously classify Emrich's income by failing to report commission payments by Triangle to Emrich on a Form 1099. (Emrich Resp. 37.) The record indicates that Emrich's 2018 tax documents, including Emrich's Form 1099, were erroneous due to a clerical mistake in Triangle's computer system. (McCaskill Aff. ¶ 13.) Defendants maintain that discrepancies on Emrich's Form 1099 were clerical errors and that Hornwood has addressed these errors with Triangle's accountant. (Defs.' Br. Supp. 35.) Indeed, at the time of the briefing on Defendants' motion for summary judgment, it appeared from the record that, at Hornwood's instruction, revised tax records were being prepared. (McCaskill Aff. ¶ 13–14.) While these facts could indicate negligence on the part of Defendants, Plaintiff has not shown how it was injured by the alleged misconduct. Therefore, the

Motion is **GRANTED** to the extent Defendants seek dismissal of Emrich's breach of duty claim regarding Triangle's tax records.

(4)   Halting Cash Distributions

142.   Plaintiff claims that Hornwood breached its duty to Triangle and Emrich by refusing to distribute available funds to the members of Triangle.

143.   Plaintiff argues that Hornwood's decision to cease payments to Emrich, together with Hornwood's decision to charge Triangle higher prices for its fabric, both beginning in June 2019, indicate bad faith on the part of Hornwood and rebuts the presumption afforded Defendants by the business judgment rule.   However, the record reflects that, as of May 2020, Triangle had over $180,000 in past due accounts payables and as of November 2020, was experiencing net losses.   (C. Horne Aff. ¶ 7.) In fact, the record indicates that Hornwood called for Triangle's members to contribute capital to Triangle to ensure Triangle retained sufficient cash to operate, (C. Horne Aff. ¶ 8.), and that when Emrich refused to do so, Hornwood loaned $120,000 to Triangle to meet its ongoing expenses. (C. Horne Aff. ¶ 12.) Furthermore, even though Hornwood increased its prices charged to Triangle, Hornwood continued to charge Triangle less than the market rate.  (Hornwood Letter ¶ 2.)

144.   Based on the record before it, the Court determines that Plaintiff has not submitted sufficient evidence to rebut the presumption afforded by the business judgment rule that Defendants acted in good faith when deciding to halt cash distributions—particularly when the record reflects that Triangle faced financial difficulty less than one year later.  Because the business judgment rule applies to the

conduct at issue and because Emrich has not rebutted the presumption afforded by the rule, the Motion is therefore **GRANTED** to the extent Defendants seek dismissal of Emrich's breach of duty claim regarding cash distributions to Triangle's members.

c. The Economic Loss Rule

145. Defendants seek summary judgment as to Plaintiff's claim for breach of fiduciary duty regarding Hornwood's decision to raise the prices it charged Triangle for fabric. (Br. Supp. Defs.' Mot. 36.) Defendants do not argue that the business judgment rule insulates this conduct,[8] but instead contend solely that the economic loss rule bars the claim because the claim is "solely based on Hornwood's contractual obligation in the Joint Venture Agreement and not Hornwood's fiduciary relationship with Triangle." (Br. Supp. Defs.' Mot. 36.)

146. "The economic loss rule, as it has developed in North Carolina, generally bars recovery in tort for damages arising out of a breach of contract[.]" *Rountree v. Chowan Cty.*, 252 N.C. App. 155, 159 (2017). A claimant may not maintain a tort action, "against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639 (2007). "To state a viable claim in tort for conduct that is also

---

[8] Defendants' decision to not claim entitlement to summary judgment on the basis of the business judgment rule is consistent with this Court's prior decisions. In selling its fabric to Triangle, Hornwood was engaged in a self-interested transaction. "While it may be appropriate for a fiduciary to negotiate in his own interest, it does not follow that he is entitled to the business judgment rule when doing so." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, *45–46 (N.C. Super. Ct. Sept. 26, 2017).

alleged to be a breach of contract, 'a plaintiff must also allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract.' " *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *48 (N.C. Super. Ct. Nov. 3, 2011) (quoting *Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009)).

147. This Court has observed that "a contracting party may have fiduciary duties to his counterparty that are separate and distinct from his contractual duties and thus may be enforceable in tort." *Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at *17 (N.C. Super. Ct. April 1, 2021); *see also Perry v. Frigi-Temp Frigeration, Inc.*, 2020 NCBC LEXIS 100, at *17 (N.C. Super. Ct. Sept. 3, 2020). Here, Emrich's claims for breach of fiduciary duty against Hornwood arise from the duties Hornwood owed as majority member and manager of Triangle. Those duties are independent from any contractual duties the operating agreement may require of Hornwood. Thus, the economic loss rule does not bar Emrich's claims.

148. Accordingly, the Court concludes that Emrich has come forward with sufficient evidence to demonstrate both a breach of fiduciary duty by Hornwood and an injury such that summary judgment on this claim would be improper.

d. Proximate Cause

149. Defendants next contend that even if Hornwood breached fiduciary duties owed to Emrich concerning the CVG Trials and its conduct is not insulated by the business judgment rule, "there is no evidence Hornwood's alleged acts proximately caused damage to Triangle." (Br. Supp. Defs.' Mot. 36.) Emrich replies that the

record contains ample evidence to suggest that Hornwood's actions in preparation for the CVG trials and Triangle's subsequent performance in the CVG Trials were the direct cause of Triangle losing the Freightliner program and failing to obtain the M2 program.

150. Proximate cause is "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred." *Adams v. Mills*, 312 N.C. 181, 192 (1984). Proximate cause exists only where "the risk of injury . . . is within the reasonable foresight of the defendant." *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 403 (1979). "Proximate cause is ordinarily a question of fact for the jury" and courts should decide proximate cause as a matter of law "only in exceptional cases, in which reasonable minds cannot differ as to the foreseeability of injury." *Id.*

151. This is not such a case. There is evidence in the record indicating that, but for Hornwood's alleged misconduct, Triangle would have maintained the Freightliner program. Emrich has provided evidence that Triangle, through Hornwood, did not inform Mueller of CVG's specifications for foam thickness and roll length. (Fenton Aff. ¶¶ 27–28.) The record also indicates that the CVG Trials were held following a series of quality control issues with Triangle products, and that the outcome of the Freightliner Trials "led CVG to conclude that Triangle was not reliable and . . . that issues would continue with Triangle if Triangle remained the supplier[.]" (Fenton Aff. ¶ 34.) On the other hand, Hornwood presents evidence that Hornwood communicated CVS's trial specifications to Mueller. (*See* Defs.' Ex. 20, 5, ECF No.

151.20.) Given the conflicting evidence, reasonable minds can differ as to the foreseeability of injury. As a result, the issue of proximate cause must be determined by the jury, and Defendants' Motion on this point is **DENIED**.

e. Lost Profits

152. Defendants contend that Emrich's breach of fiduciary duty claims seeking lost profits from the Freightliner program and the M2 program should be dismissed because Emrich has failed to establish lost profits with any reasonable degree of certainty. (Br. Supp. Defs.' Mot. 39–40.)

153. In support of its claim for lost profits, Emrich relies on Erik Lioy's ("Lioy") expert report, which Defendants contend is "based on numerous assumptions that are 'purely speculative in nature[.]'" (Br. Supp. Defs.' Mot. 39.) Defendants argue that Lioy's expert report fails to establish lost profits with reasonable certainty because it is not based on "economic and financial data, market surveys and analysis, or business records of similar enterprises." (Br. Supp. Defs.' Mot. 40.) Defendants further contend Lioy's expert report ignores "the Bondtex exit, the Mueller problems, the lack of agreement between Triangle and CVG, Guilford's efforts, no vertical integration at Triangle, [and] Triangle's precarious financial position[.]" (Br. Supp. Defs.' Mot. 40.) Conversely, Emrich contends that Lioy's opinion is reliable, data-driven, and satisfies the requisite standard to survive summary judgment.

154. Under North Carolina law, "the party seeking damages bears the burden of showing that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Olivetti*

*Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 546 (1987). For parties seeking to recover lost profits, "[a]bsolute certainty is not required but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 292 N.C. 557, 561 (1977).

155. Defendants cite language from *Iron Steamer, Ltd. v. Trinity Restaurant, Inc.* to support their argument that Lioy's report is insufficient because it is not based on "expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises." 110 N.C. App. 843, 849 (1993). But *Iron Steamer* dealt with an "unestablished resort restaurant," a factual scenario materially distinguishable from the facts in this case. *Id.*

156. Triangle is an established business that has operated since 2006. Triangle's past dealings with CVG and the Freightliner program enabled Lioy, when preparing a forecast of lost sales, to "perform an analysis of the historical sales by Triangle and Guilford Mills under the CVG/Freightliner Program." (Exp. Report. Erik C. Lioy ¶ 54, ECF No. 151.42. ["Lioy Report"].) Further, Lioy arrived at a discount rate by taking into account "the nature of the cash flow stream, risk, timing, and interest rate environment." (Lioy Report ¶ 66.) Lioy's report is sufficiently specific to allow a jury to arrive at a reasonable conclusion. As a result, Defendants' Motion is **DENIED** to the extent it seeks dismissal of Plaintiff's claim for lost profits.

## VI.    CONCLUSION

157.  For the foregoing reasons, the Court hereby **GRANTS** Plaintiff's Motion and **GRANTS** in part and **DENIES** in part Defendants' Motion as follows:

A. The Court **GRANTS** summary judgment in favor of Defendants on Emrich's breach of fiduciary duty claim regarding Hornwood's management of Triangle's transition to Mueller;

B. The Court **GRANTS** summary judgment in favor of Defendants on Emrich's breach of fiduciary duty claim regarding Triangle's management of its accounts receivable and its tax records;

C. The Court **GRANTS** summary judgment in favor of Defendants on Emrich's breach of fiduciary duty claim regarding Hornwood's decision to cease cash distributions to members of Triangle.

Except as expressly **GRANTED** herein, the Motions are **DENIED.**

**SO ORDERED** this the 15th day of February, 2022.


/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases